FILED

MAY 1 1 2012

UNITED STATES DISTRICT COURT
DISTRICT OF SOUTH DAKOTA
SOUTHERN DIVISION

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

|  |  |
|---|---|
| BETTY J. SALVESON, | CIV. 10-4045 |
| Plaintiff, | |
| -vs- | MEMORANDUM OPINION AND ORDER |
| KATHLEEN SEBELIUS in her capacity as Secretary of the US Department of Health and Human Services, | |
| Defendant. | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

Plaintiff, Betty Salveson (Salveson) seeks judicial review of the decision of the Secretary of the Department of Health and Human Services (HHS) denying her request for a waiver and/or reduction of an alleged overpayment in the amount of $110,864 assessed under the Medicare Secondary Payer (MSP) statute, 42 U.S.C. § 1395y(b)(2). The Social Security Act authorizes judicial review at 42 U.S.C. § 405(g) and permits the reviewing court "to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the [Secretary], with or without remanding the case for a rehearing." The statute further provides the "findings of the [Secretary] as to any fact, if supported by substantial evidence, shall be conclusive."[1] Salveson has filed a Complaint and has requested the Court to reverse the Secretary's final decision denying her request for a refund of the entire amount she has requested in reimbursement from Medicare ($110,864), or in the alternative, to require the Secretary to refund $32,190, which Salveson alleges "reflects the cost of the initial non-negligent surgery and the subsequent care she received at Huron Regional Medical Center." Salveson also requests pre-judgment and post-judgment interest.

---

[1] 42 U.S.C. § 405(h) is made applicable to the Medicare program through 42 U.S.C. § 1395ii, and therefore restricts Salveson's judicial review as provided by 42 U.S.C. § 405(g).

## JURISDICTION

This appeal of the Secretary's final decision denying Salveson's request for reimbursement is properly before the District Court pursuant to 42 U.S.C. § 405(g).

## MEDICARE SECONDARY PAYER STATUTE–OVERVIEW

The Medicare program provides health insurance benefits for qualified elderly and disabled persons. *See* 42 U.S.C. §§1395 et. seq. Medicare's Secondary Payer Statute (MSP) "was enacted in order to preserve Medicare's financial integrity, curb skyrocketing Medicare costs, and reverse the payment order so that liability insurers and others are primary payers where there is overlapping insurance coverage, rather than Medicare. Where it is clear that an insurance company will pay for these costs, the government should not pay the medical bills." *Wall v. Leavitt*, 2008 WL 4737164 (E.D. Cal.) at *10.

The MSP statute has been amended several times since it was enacted. As it applied to Salveson when her claim arose in 2004, the MSP statute stated in part:

(2) Medicare secondary payer

> (A) In general
>
> Payment under this subchapter may not be made, except as provided in subparagraph (B), with respect to any item or service to the extent that –
>
> (i) payment has been made, or can reasonably expected to be made, with respect to the item or service are required under paragraph (1), or
> (ii) payment has been made or can reasonably be expected to be made under a workmen's compensation law or plan of the United States or a State or under an automobile or liability insurance policy or plan (including a self-insured plan) or under no-fault insurance.
>
> In this subsection, the term 'primary plan' means a group health plan or large group health plan, to the extent that clause (i) applies, and a workmen's compensation law or plan, an automobile or liability insurance policy or plan (including a self-insured plan) or no fault insurance, to the extent that clause (ii) applies. An entity that engages in a business, trade, or profession shall be deemed to have a self-

2

insured plan if it carries its own risk (whether by failure to obtain insurance, or otherwise) in whole or in part.

(B) Conditional payment

(i) Authority to make conditional payment

The Secretary may make payment under this subchapter with respect to an item or service if a primary plan described in subparagraph (A)(ii) has not made or cannot reasonably be expected to make a payment with respect to such item or service promptly (as determined in accordance with regulations). Any such payment by the Secretary shall be conditioned on reimbursement to the appropriate Trust Fund in accordance with the succeeding provisions of this subsection.

(ii) Repayment required

A primary plan, and an entity that receives payment from a primary plan, shall reimburse the appropriate Trust Fund for any payment made by the Secretary under this subchapter with respect to an item or service if it is demonstrated that such primary plan has or had a responsibility to make payment with respect to that item or service. **A primary plan's responsibility for such payment may be demonstrated by a judgment, a payment conditioned upon the recipient's compromise, waiver, or release (whether or not there is a determination or admission of liability) of payment for items or services included in a claim against the primary plan's insured,** or by other means. If reimbursement is not made to the appropriate Trust Fund before the expiration of the 60 day period that begins on the date of notice of, or information related to, a primary plan's responsibility for such payment or other information is received, the Secretary may charge interest (beginning with the date on which the notice or other information is received) on the amount of the reimbursement until the reimbursement is made (at a rate determined by the Secretary in accordance with regulations of the Secretary of the Treasury applicable to charges for late payments).

**

(v) Waiver of rights. The Secretary may waive (in whole or in part) the provisions of this subparagraph in the case of an individual claim if the Secretary determines that the waiver is in the best interests of the program established under this subchapter.

42 U.S.C. § 1395y(b)(2) (emphasis added).

*Mason v. Sebelius*, 2012 WL 1019131 (D. N.J.) provides a summary of the evolution of Medicare's Secondary Payer Statute (MSP):

3

> As it was first enacted, Medicare was the primary payer for medical costs required by beneficiaries, even if the beneficiary could also recoup some or all of the necessary benefits from another source, such as private health insurance. In 1980, Congress amended the Medicare statute to include the Medicare Secondary Payer provisions, which required Medicare to serve only as a secondary payer when a beneficiary could recover benefits from another source. 42 U.S.C. § 1395y(b). The MSP provisions prohibited payment of Medicare benefits to beneficiaries when a primary payer could be expected to promptly pay such benefits; and permitted Medicare to seek reimbursement of funds paid to a beneficiary if a primary payer subsequently was deemed to be responsible for such payment. 42 U.S.C. § 1395y(b)(2)(A), (B). Until amendment in 2003, the MSP provisions were limited by federal courts to only authorizing Medicare reimbursement from primary plans, such as private health insurance plans, that could be expected to pay benefits to the beneficiary 'promptly' and has a preexisting obligation to pay such benefits. In 2003, however, the MSP provisions were further amended to permit Medicare to seek reimbursement from other responsible sources, such as tortfeasors, who were determined to be responsible for payment of the beneficiary's medical expenses.
>
> \*\*\*\*
>
> Thus, the 2003 amendments, in part, operated to prevent responsible tortfeasors or recovering tort plaintiff/beneficiaries from retaining the medical expenses paid by Medicare.

*Mason v. Sebelius*, 2012 WL 1019131 (D. N.J.) at \*8-9 (citations omitted, formatting altered).

## ADMINISTRATIVE PROCEEDINGS

On February 5, 2008, Salveson submitted a written request to Medicare, asking for a complete waiver of Medicare's right to reimbursement for amounts paid by it to cover conditional medical expenses paid on Salveson's behalf during a time period beginning in December 2004. On February 8, 2008, Salveson settled a medical malpractice lawsuit for $621,000. On July 23, 2008, Medicare demanded reimbursement of approximately $120,715.88 in conditional medical claims Medicare paid on Salveson's behalf. On August 2, 2008, the Medicare Secondary Payer Recovery Contractor (MSPRC) notified Salveson's attorney that the Medicare reimbursement amount had been calculated incorrectly. The correct amount due to Medicare, considering the settlement amount ($621,000) and prorating Medicare's claim based on adjustments for attorney's fees and expenses, was $110,864.23. On August 12, 2008, Salveson's attorney mailed a check in the amount of $110,864.23 to Centers for Medicare Services (CMS). Plaintiff's payment to CMS stopped interest from accruing while Salveson pursued her administrative appeals.

4

In a letter dated August 25, 2008, the MSPRC affirmed its original determination of the amount due to Medicare ($110,864.23). The MSPRC indicated Salveson had provided "no new information or documentation" upon which to grant her requested waiver of the disputed charges. "After careful review, we have determined the charges are related to the accident on December 20, 2004 and can not be removed from Medicare's demand amount." AR 262. The letter also advised Salveson of her appeal rights. The next day (August 26, 2008), MSPRC sent Salveson another letter which again acknowledged her request for a waiver of Medicare's reimbursement rights, and which requested her to complete a "form SSA 632-BK" which allows a Medicare beneficiary to demonstrate financial hardship.

Salveson did not complete the form SSA 632-BK but instead, on February 20, 2009, filed a Request for Reconsideration (AR 173-79). Maximus Federal Services, the contractor which reviewed Salveson's claim, denied her Request for Reconsideration. AR 166-171. On June 24, 2009, Salveson appealed the denial of her Request for Reconsideration. AR 91. On August 11, 2009, a telephonic hearing was held in Irvine, California, before an Administrative Law Judge (ALJ). AR 434-72. The ALJ issued a written opinion (AR 13-23) on September 28, 2009. The ALJ affirmed the previous decisions and denied Salveson's request for a waiver of the amount conditionally paid by Medicare. On November 30, 2009, Salveson appealed the ALJ's decision to the Medicare Appeals Council. AR 9-11. On March 3, 2010, the Medicare Appeals Council issued the final agency decision, adopting the decision of the ALJ. AR 3-5. Salveson then filed her Complaint in the District Court, seeking judicial review of the Secretary's final decision.

## FACTUAL BACKGROUND

Betty Salveson was admitted to the Huron Regional Medical Center on December 20, 2004 for surgery to repair a hernia. The surgeon (Dr. Miller) repaired the hernia but during the course of the surgery, "nicked" Salveson's bowel. The nick in Salveson's bowel resulted in fecal material leaking into her abdominal cavity, eventually causing infection and then sepsis. By December 30,

2004, Dr. Miller determined further surgery was required.[2] On December 30, 2004, Dr. Miller performed a second surgery (a "re-anastomosis") upon Salveson at the Huron Regional Medical Center. Salveson's condition worsened, and she was eventually transferred to a hospital in Sioux Falls, where she underwent extensive further medical care and convalescence.

Salveson filed medical malpractice lawsuits in both state and federal courts in South Dakota (*Betty J. Salveson v. Linda Miller, M.D. and Adel Hassan M..D.)* United States District Court for the District of South Dakota, Southern Div. Civ. No. 06-4229; and Circuit Court, Third Judicial Circuit, Beadle County, South Dakota, Civ. No. 06-417. The state court Complaint is not contained in the record, but the Court takes judicial notice of the federal Complaint, which is accessible to the Court by CM/ECF[3] and a copy of which is attached to the Defendant's Answer (Doc. 9-1). In Count I, the Complaint alleges in part that "Defendants breached the applicable standard of care for a physician or surgeon when they failed to properly diagnose, treat and care for Plaintiff between December 20, 2004 and January 11, 2005 and [a]s a result of Defendants' negligence, Plaintiff has suffered damages, including . . . extensive medical expenses . . " *Id.* at ¶¶ 17,19.

Salveson's lawyers retained an expert (Dr. Bergman) to evaluate the care she received from her physicians. Dr. Bergman provided criticism of the care Salveson received from her physicians during the time she spent at the Huron Regional Medical Center. *See* Bergman deposition, AR 103-63.[4] In her brief, (Doc. 11, p. 8) Salveson highlights Bergman's criticism of Dr. Miller's decision to perform the re-anastomosis on December 30, which he specifically characterized as a violation of the standard of care. AR 168. Drs. Miller and Hassan also retained experts, who opined that

---

[2] By this time, Medicare was responsible for approximately $32,190 of the medical bills incurred by the Plaintiff.

[3] Case Management/Electronic Case Filing (CM/ECF) is the Federal Judiciary's comprehensive case management system for all bankruptcy, district and appellate courts. CM/ECF allows courts to accept filings and provide access to filed documents over the internet. www.pacer.gov/cmecf

[4] Excerpts of Dr. Bergman's deposition are contained in several different places of the administrative record. The entire deposition, however, is contained at pp. 103-64.

Miller and Hassan did not violate the standard of care. *See* Expert Disclosure Reports, AR 221-26, 231-34, 238-39, 241-42, 378-79. Ultimately, on February 8, 2008, in exchange for $621,000.00, Salveson settled "all claims which are the subject matter of the lawsuits entitled *Betty J. Salveson v. Linda Miller, M.D. and Adel Hassan M.D.* venued in (1) United States District Court for the District of South Dakota, Southern Div. Civ. No. 06-4229; and (2) Circuit Court, Third Judicial Circuit, Beadle County, South Dakota, Civ. No. 06-417." *See* "Release of All Claims," AR 250-52.

Of Salveson's medical expenses for the time frame in question, Medicare conditionally paid $194, 543.63. AR 321-23, 324-51. Medicare agreed to accept a reduced amount ($110,864.23) pursuant to a formula prescribed by the provisions of the Code of Federal Regulations (42 C.F.R.§ 411.37(a) which mandate that Medicare must "reduce its recovery to take account of the cost of procuring the judgment or settlement .. if .. (i) procurement costs are incurred because the claim is disputed and (ii) those costs are borne by the party against which CMS seeks to recover." When Medicare refused Salveson's request to waive altogether its right to reimbursement, Salveson paid $110,864.23 to Centers for Medicare Services (CMS) and instituted the administrative process to attempt to recover the funds.

## ANALYSIS

### Standard of Review

The Social Security Act authorizes judicial review of the final decision of the Secretary as provided by 42 U.S.C. § 405(g). *See* 42 U.S.C. §§1395ff(b). The decision of the Appeals Council, which adopted the ALJ's decision, is considered the Secretary's final decision. *Heckler v. Ringer*, 466 U.S. 602, 607, 104 S.Ct. 2013, 80 L.Ed.2d 622 (1984). The Court's review is limited to determining whether, in light of the record as a whole, the Secretary's determination is supported by substantial evidence. 42 U.S.C. § 405(g). Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (citation and internal quotation marks omitted). The Court must also decide whether the Secretary applied the proper legal standard. *Papciak v. Sebelius*, 742 F. Supp.2d 765, 768 (W.D. Pa. 2010). The Court reviews the Secretary's conclusions

of law de novo. *Keefe v. Shalala*, 71 F.3d 1060, 1062 (2d Cir. 1995). The Court must give deference and controlling weight to the interpretation assigned by the Department of Health and Human Services to its own regulations "unless it is plainly erroneous or inconsistent with the regulation." *Thomas Jefferson Univ. v. Shalala*, 512 U.S. 504, 512, 114 S.Ct. 2381, 129 L.Ed.2d 405 (1994) (citation omitted, punctuation altered). Finally, one more standard is applicable in this case; under the *Chevron* standard, if 'Congress has directly spoken to the precise question at issue in the text of the statute, [the court] gives effect to Congress's answer without regard to any divergent answers offered by the agency or anyone else." *Hadden v. United States*, 661 F.3d 298, 301 (6th Cir. 2011) *citing Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc.*, 467 U.S. 837, 842-43, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984).

### 1.     The Secretary's Decision

The Administrative Law Judge issued a written decision dated September 28, 2009 (AR 13-23). The decision affirmed all previous denials of Salveson's request for reimbursement of Medicare's conditional payment of $110,864.23. In his written decision, the ALJ identified the issue as "whether [Salveson] is entitled to waiver of recovery of the Medicare overpayment, pursuant to Section 1870(c) of the Medicare Act, or whether the recovery can otherwise be reduced or eliminated." AR 14.

The ALJ recounted the factual history of Salveson's claim, including the medical malpractice action against her physicians which alleged malpractice during a time frame beginning on December 20, 2004. AR 15. The ALJ specifically noted Salveson's settlement document (AR 73) in which Salveson settled her malpractice claim for $621,000. The ALJ acknowledged that Salveson's request for a waiver of reimbursement was based on her assertion that "there is not sufficient basis for Medicare to assert a claim against [her] settlement proceeds for all its conditional payments during the dates of services from January 4, 2005 through January 26, 2007." AR 16. The ALJ also acknowledged Salveson's assertion that "pursuant to 42 U.S.C. 1395y(b)(2)(B)(ii), Medicare may only seek reimbursement for any payment made by Medicare if it is demonstrated that the plan has or had a responsibility to make payment with respect to the item or service." *Id.* The ALJ noted

Salveson's theory that because "it [could] not be demonstrated" that not all the items and services for which Medicare sought reimbursement were caused by her physicians' negligence; the physicians' insurers did not have the responsibility to make payment on those items and services. AR 16. Finally, the ALJ reiterated that Salveson did not complete the Waiver of Overpayment Form SSA-632-BK because Salveson did not believe she met the requirements for financial hardship. *Id.*

Next, the ALJ cited the applicable statutes and regulations. AR 17-18. The ALJ referred to the Medicare Secondary Payer Statute portion of the Social Security Act, 42 U.S.C. § 1395y(b)(2)(A) & (B).[5] He also referred to the accompanying relevant Code of Federal Regulation sections, CFR §§411.20 et. seq. Finally, the ALJ cited several applicable policies and guidelines from the MSP manuals. AR 19-20.

In the "Analysis" section of his decision, the ALJ discussed the basis of the decision below (Salveson's failure to complete a Request for Waiver of Overpayment (Form SSA-632-BK) based on financial hardship. AR 21. The ALJ, however, analyzed both Salveson's lack of financial hardship and her alternative assertion that Medicare is not entitled to reimbursement because the expenses related to the physicians' alleged negligence cannot not be distinguished from the remaining medical expenses. The ALJ rejected Salveson's argument, stating:

> According to MSPRC's Payment Summary Form, it appears that Medicare used a standard form to calculate its share of recovery. EX3, pp. 51. Appellant does not supply legal support for applying a proportionate share of recovery based on a percentage liability. Although the Appellant's post-hearing brief included succinct statements regarding burden of proof substantiated by Federal District Court cases, there is no Federal Court case or other Federal law or policy that supports a proportion rate of recovery based on a percentage. This is especially true when no court has issue (sic) findings or obtained a verdict setting out a percentage of liability or amount of damages.
>
> Moreover, Section 50.6.5.2 of Chapter 7 of the Medicare Secondary Payer (MSP) Manual provides guidelines for determining when recovery would be against equity and good conscience. According to the CMS manual section, 'equity and good

---

[5]The ALJ referred to the MSP portion of the Social Security Act in its Pub. Law format, Section 1862(b)(2)(A) & (B).

9

> conscience' is based on the totality of the circumstances in a particular case and the factors to be considered include, for example, the degree to which recovery would cause undue hardship for the beneficiary. Here, the undersigned ALJ finds that recovery of the Medicare lien would not cause the Appellant a great financial hardship. The undersigned ALJ also finds that a waiver of the overpayment recovery would be inappropriate. Accordingly, recovery of the overpayment would not be against equity and good conscience due to the totality of the circumstances in this particular case.

AR 22. The ALJ concluded "the Appellant is not entitled to a waiver, reduction or elimination of the Medicare lien." *Id.*

### 2. The Secretary's Decision Applies the Proper Legal Standard and Is Supported by Substantial Evidence

The ALJ analyzed whether waiver of reimbursement should be allowed under the Medicare guidelines which allow waiver if recovery under the Medicare Secondary Payer program would be against "equity and good conscience." AR 22. The ALJ explained that according to policy, this determination is based upon the totality of the circumstances in each case, including whether to allow Medicare reimbursement would cause the beneficiary financial hardship. *Id.* The ALJ found that a waiver of reimbursement would not result in financial hardship to Salveson and accordingly, recovery would not be against equity and good conscience. *See Hadden* 661 F.3d at 305; (Secretary may waive if reimbursement is 'against equity and good conscience' citing 42 U.S.C. § 1395gg(c); *Haro v. Sebelius*, 2011 WL 2040219 (D. Ariz.) (same). Salveson did not complete the form SSA 632-BK which would have provided a factual basis to claim financial hardship, and she has never asserted that allowing Medicare to recover reimbursement in its entirety would cause her a financial hardship. During the hearing, Salveson's attorney candidly admitted Salveson did not believe she qualified for a financial hardship. AR 463. Salveson does not claim financial hardship. The Secretary's determination that it is not against equity and good conscience to deny her request for a waiver, reduction or elimination of the Medicare lien is legally sound and is supported by substantial evidence.

Salveson asserts Medicare is not entitled to reimbursement because it has not met its burden of demonstrating which services and charges stem from negligent versus non-negligent care. *See*

Salveson's Brief (Doc. 11) and Reply Brief (Doc. 13). She relies primarily upon three cases: *Estate of Urso v. Thompson*, 309 F.Supp.2d 253 (D. Conn. 2004); *United States v. Weinberg*, 2002 WL 32356399 (E.D. Pa.); and *Rotech Healthcare, Inc. v. Huff*, 2011 WL 843968 (C.D. Ill.). The Court, however, finds none of those cases persuasive. *Rotech* is not a Medicare case at all and the opinion has since been vacated (*see Rotech Healthcare v. Huff*, 2011 WL 3022236 C.D. Ill.). The facts which form the basis of *Urso* and *Weinberg* and the Medicare statutes upon which they were decided pre-date the 2003 amendments to the Medicare Secondary Payer Statute, applicable to Salveson, discussed above. Specifically relevant is the current version of 42 U.S.C. § 1395y(b)(2)(B)(ii).

More persuasive is *Hadden v. United States*, 661 F.3d 298 (6th Cir. 2011). *Hadden* is factually similar to Salveson's case, because the Medicare beneficiary settled a tort claim (auto accident) but disputed Medicare's right to reimbursement after it had paid his medical bills in full. Hadden claimed his injury was

> primarily the fault of an unidentified motorist who had caused the [defendant's] truck to swerve into him; that motorist was responsible for 90% of Hadden's damages, with [the defendant] responsible for only 10%; and thus [the defendant's] payment of $125,000 represented only 10% of Hadden's total damages, meaning that it only compensated him for 10% of his medical expenses, or about $8,000. The remaining $117,000 or so of the settlement, Hadden says, compensated him for damages other than medical expenses (e.g. pain and suffering–and was therefore off limits to Medicare.

In light of the plain language of the MSP statute, the ALJ in *Hadden* "took a dim view" of Hadden's assertion that Medicare was required to waive or take a reduced payment. *Hadden* 661 F.3d at 301.

It is undisputed that Salveson is an "entity that received payment from a primary plan" within the meaning of 42 U.S.C. § 1395y(b)(2)(B)(ii). The statute states in relevant part:

> (2) Medicare secondary payer
> (B) Repayment required
> (ii) Primary plans
> A primary plan, and an entity that receives payment from a primary plan, shall reimburse the appropriate Trust Fund for any payment made by the Secretary under this subchapter with respect to an item or service if it is demonstrated that such primary plan has or had a responsibility to make a payment with respect to such item or service . . . .

11

Although their theories about why Medicare is not entitled to full reimbursement are slightly different, the common thread between this case and *Hadden* is the proper interpretation of the term "responsibility." Salveson asserts that it has not been shown that the primary plan has the "responsibility" to make payment with respect to *any* item or service because Salveson's own expert in her malpractice case could not definitively separate which medical care she received was necessitated by what she now alleges was her physicians' malpractice (the December 30 surgery), and which medical care would have been necessary had no malpractice occurred. At the very least, Salveson argues, none of the medical charges incurred between her first surgery on December 20, 2004 and her second surgery on December 30, 2004 should be recoverable by Medicare, because (she claims) the record contains "not a scintilla of competent expert medical testimony" that any malpractice occurred before the second surgery. *See* Salveson's Reply Brief, Doc. 13, p.11.[6]

It is not necessary for the Court, however, to re-hash the merits of Salveson's malpractice claim because "Congress has directly spoken to the issue–in a way highly unfavorable to [Salveson]" *Hadden v. United States*, 661 F.3d 298, 302 (6th Cir. 2011). The 2003 amendment to the MSP statute "leaves no room" for Salveson's position. *Id.* Specifically, in 2003, Congress amended 42 U.S.C. § 1395y(b)(2)(B)(ii) to add the language in italics below:

---

[6]This statement is not entirely accurate. Dr. Bergman articulated several criticisms which he believed rose to the level of a violation of the standard of care. One of those criticisms was the excessive dose of steroids administered to Salveson both before and after the December 20 surgery. AR 56, 168. Bergman opined that the high dose steroids contributed to the failure of the first (December 20) anastomosis, masked the symptoms, and contributed to the delay in diagnosing the problem. AR 56-57. In his deposition, Dr. Bergman repeatedly mentioned the inappropriateness of the use of and the high dosage of steroids (AR 56-57, 69, 72, 78-88, 129, 142-43, 145, 168, 228). In response to a question about how Salveson's outcome would have been different had she received appropriate care from Dr. Miller in Huron, South Dakota, Dr. Bergman said, "I believe if she had not been on the steroids, she probably would not have developed the first small anastomotic leak, that might have been the end of the story. The fact that she was on it masked the symptoms of the anastomotic leak. When she went back in and resected it, and re-anastomosed it, which failed again, I think that was below the standard of care . . ." AR 228. The defense experts retained by Dr. Miller directly addressed and contradicted Dr. Bergman's theory about the effect of the use and dosage of steroids upon Salveson's ultimate outcome. *See* expert disclosure report, AR 238, 241. Dr. Bergman also listed as a violation of the standard of care the fact that "[Salveson] was not evaluated properly preop before the 20th, they should have done a nutritional status, especially since they knew she was not eating well and she had lost weight. . . ." AR 169.

12

> A primary plan, and any entity that receives payment from a primary plan, shall reimburse the appropriate Trust Fund for any payment made by the Secretary under this subchapter with respect to an item or service if it is demonstrated that such primary plan has or had a responsibility to make payment with respect to such item or service. *A primary plan's responsibility for such payment may be demonstrated by a judgment, a payment conditioned upon the recipient's compromise, waiver, or release (whether or not there is a determination or admission of liability) of payment for items or services included in a claim against the primary plan or the primary plan's insured, or by other means.*

*Id.* (emphasis added). Under 42 U.S.C. § 1395y(b)(2)(B)(ii), as amended in 2003,

> if a beneficiary makes a claim against a primary plan and later receives a payment from the plan in return for a release as to that claim, then the plan is deemed responsible for payment of the items or services included in the claim. Consequently, the scope of the plan's responsibility for the beneficiary's medical expenses –and thus of his own obligation to reimburse medicare–is ultimately defined by the scope of *his own claim against the third party.* That is true even if the beneficiary later compromises as to the amount owed on the claim, and even if the third party never admits liability.

*Hadden*, 661 F.3d at 302 (emphasis in original).

Salveson objects to the settlement agreement as establishing the primary plan's responsibility for payment, but her objections are not persuasive. First, although Fed. R. Evid. 408 ordinarily precludes the fact of settlement to prove liability as to a tort action, this is not an ordinary tort action. When repayment of Medicare costs are concerned, Congress specifically determined that "responsibility for such payment *may be demonstrated by . . . a payment conditioned upon the recipient's . . . release* (whether or not there is a determination or admission of liability) *of payment for items or services included in a claim against the primary plan or the primary plan's insured . . .*". Likewise, that a copy of the underlying malpractice Complaint is not contained in the administrative record does not defeat Medicare's right to recovery. The Court make properly take Judicial notice of the Complaint, which is accessible via CM/ECF. *Matter of Phillips*, 593 F.2d 356 (8th Cir. 1979) . Additionally, both the state and federal lawsuits are specifically incorporated into the Release (AR 73-75) as defining the scope of the claims discharged. The ALJ's determination that the Salveson is not entitled to a waiver, reduction or elimination of the Medicare lien is legally sound and is supported by substantial evidence.

**ORDER**

For the reasons more fully explained above, it is ORDERED that the decision of the Secretary is AFFIRMED, and that Plaintiff's Complaint (Doc. 1) is DISMISSED, with prejudice, Plaintiff taking nothing thereunder.

Dated this 11th day of May, 2012.

BY THE COURT:

Lawrence L. Piersol
United States District Judge